## Case No. 6,675.

### HOOPER et al. v. The HIRAM.

[Fish. Pr. Cas. 69; 1 Car. Law Repos. 190.]

District Court, D. Massachusetts. Feb. 6, 1813.

PRIZE — DESTINATION — LICENSE FROM ENEMY— NEUTRALITY—PURCHASE OF GOVERNMENT BILLS.

[1. During hostilities between Great Britain and the United States, a vessel and her cargo owned by citizens of the latter country were captured by an American privateer when sailing for Lisbon, Portugal, with the intention of there selling the cargo at the risk and for the account of the owners, the proceeds to be remitted to England. The captured vessel was in possession of a license from the British consul for her safeguard from seizure from British men-of-war. It was *held* that, under such circumstances, the vessel was not lawful prize, and she was ordered to be restored to the claimants.]

[See note at end of case.]

[2. Neutral vessels have a peculiar character impressed upon them by the special nature of their documents with which they are invested. A distinction is to be made, however, between a complete adoption of a hostile character and a pass or license for a particular purpose, relative to the enemy's trade.]

[See note at end of case.]

[3. In such a case, the bona fide purchase by the neutral of English "government bills" by the sale of the cargo would not be a cause of forfeiture owing to the intimate connection of international trade, even though such a purchase would indirectly benefit the enemy.]

[See note at end of case.]

[In admiralty. Libel by Asa Hooper, and the master, owners, and crew of the private brig Thorn, against the brig Hiram and her cargo, whose master was John B. Barker. The case was heard on the claim of Samuel G. Griffiths to the vessel and 28 barrels of flour, and on the claim of Cornthwait and Cary and others to the remainder of the cargo.]

DAVIS, District Judge. This vessel, laden with flour and bread, sailed from Baltimore for Lisbon, on or about the 24th September last, and on the 15th of October was captured by the Thorn, and brought into the port of Marblehead. The vessel is not entitled to a register, but is duly documented as the property of Griffiths, the claimant, by a certificate from the collector's office at Baltimore, dated June 24, 1811. Among the ship's papers delivered to the captors, there was no document specifying the owners of the cargo. The supercargo, in his examination before the commissioners at Marblehead, on the 3d of November, declares the cargo (excepting 100 barrels of bread, the master's adventure) to be the property of several shippers at Baltimore, whose names he could not recollect, though he says he had received from them letters of instruction. The master, on his examination, November 15, declares the property to be as it is claimed, naming all the shippers, as they now appear to be evidenced, excepting one, and states that he signed bills of lading to the several shippers. The omission of the name of one of the shippers, in the master's evidence, is believed to be inadvertent, as the bills of lading were not in his possession. Four days after his examination, the supercargo delivered to the commissioners a bill of lading and invoice of the whole cargo, excepting the adventure. By those documents, Samuel G. Griffiths appears the sole shipper, and his orders to the supercargo are annexed, directing him, on his arrival at Lisbon, to dispose of the cargo, and to remit the proceeds to the shipper's correspondents in Liverpool, in England. The master also had writ-

ten orders from Griffiths, the owner of the vessel, to make sale of her at Lisbon, if any advantageous offer should be made, and to remit the amount to England. By the affidavit of claim for the lading, made by the supercargo, it is stated, that only 28 barrels of flour, belong to Griffiths; that the residue belongs to the other claimants in different proportions; that a separate bill of lading [and invoice was made out for each shipper excepting Griffiths, and that the master also signed a bill of lading][1] for the whole of the cargo as the property of Griffiths; that all the separate invoices and bills of lading, with the instructions of the respective shippers, were deposited with Griffiths for safe keeping, the supercargo having first taken extracts for his guidance in relation to the disposal of the cargo; that the general bill of lading, with an invoice and letter of instructions from Griffiths, purporting the whole to be his property, were delivered to the supercargo at the time of sailing, and were on board at the time of capture. In explanation of this arrangement, it is stated, that it was thought advisable to have but few papers on board, in order to prevent embarrassment and delay, in case the vessel should be taken on her voyage, and carried into a foreign port. An objection was made to the admission of the papers delivered to the commissioners, by the supercargo, after the examination, but it was waived, and those papers were admitted by consent.

Among the papers found on board, was a license or protection, being a certified copy of a letter from Admiral Sawyer to Andrew Allen, Esq. late British consul at Boston, and an additional protection or letter of safe-conduct from Mr. Allen. The vessel being found sailing with these instruments, appears to have been the cause of capture and bringing in, though other additional grounds for condemnation have been alleged and urged on the trial, particularly the destination of the proceeds of sale of vessel and cargo according to the instructions. The variance between the asserted interest in the cargo, and the papers on board, rendered further proof of property requisite. An order was made for that purpose, after a hearing upon the papers found on board, and the preparatory examination. Exceptions were made to the testimony of the master and supercargo, in some particulars which were supposed to render further proof inadmissible. The omission to disclose the invoice, bill of lading and orders above mentioned, on the examination, is not indeed explained to entire satisfaction, especially on the part of the supercargo, to whom those papers were committed; and it must appear in a degree strange, that the supercargo should not be able, on his examination, to recollect and name the shippers, whose property was committed to his management, and of whose

[1] [From 1 Car. Law Repos. 190.]

instructions, though not then in his possession, he had taken minutes. I notice the explanations that have been offered. The omission, as to the invoice and bill of lading, whatever may have been its character, whether voluntary or inadvertent, was speedily repaired by a delivery of the papers in question to the commissioners; and I do not find the exceptions to the evidence of such a description as to justify a peremptory conclusion against the owners, and to preclude an opportunity for further proof in support of their asserted claims. That proof has been produced, together with proof relative to the manner in which the license was procured. The evidence presented fully establishes the property to be as claimed, and supports the account given in the affidavit of claim, by the supercargo, as to the ownership and arrangement relative to this voyage. The reason given for the simulation of papers, which corresponds with that given by the supercargo, I must admit to be real, though I must add, that the proposed advantage does not appear of sufficient importance to require such a disguise. It has had the common effect of such simulations, to perplex the inquiry and give a dubious character to the transaction. I know that to a limited extent there is an indulgence to such disguises in courts of admiralty, if the cause be explained to the satisfaction of the court, especially if intended to relieve from difficulties imposed by the restrictions of an enemy, and not originating in views to avoid or defraud the regulations of the country of the owners. The worst effect of such disguise, and it is a very serious one, is their liability to induce an adherence to papers on oath, by what has been denominated ship morality, too often widely different from that genuine morality, which is the basis of confidence and the great cement and support of social security and order.

Having permitted these claims to be verified by further proof, the real state of facts relative to the voyage, is clearly evidenced, in every material circumstance. The vessel and cargo are wholly owned by citizens of the United States, the destination was for Lisbon, and the cargo was there to be sold on account and risque of the owners, the proceeds to be remitted to England.

The destination was a lawful one. But it is contended that the claims should be rejected and the vessel and cargo condemned to the captors. 1. On account of the British protection or license. 2. For the destination of the proceeds, or the directions relative to the remittance, which are said to be in violation of the law of war, and the allegiance of the persons concerned in the voyage. These questions are novel and important. No express authority is produced by which they can be determined. There are no statute provisions on the subject, and it has fallen to my lot to examine the principles, to trace and estimate the an-

alogies urged or suggested as a ground of decision. This investigation has been pursued with diverted attention to other causes necessarily requiring a determination. In regard to both the questions, it is obvious, that the considerations by which they are to be governed have reference merely, to the rights and duties of a citizen in regard to his own country in a state of war. How the transaction would be viewed by the laws of nations, if the vessel had been captured by a ship of another belligerent with whom Great Britain is at war, makes no part of the present inquiry. The license, as it is called, is composed of three papers, a copy of a letter from Admiral Sawyer, dated at Halifax, August 5th, 1812. Mr. Allen's certificate annexed to and authenticating the copy, dated at Boston, Sept. 15, and another certificate from the same gentleman of the same date, addressed to all officers of his Britannic majesty's ships of war, or of privateers belonging to his subjects. It is contended that these papers stamp a hostile character on this vessel and voyage, which is insurmountable and fatal; that the American character of the vessel and adventure is forfeited by an association with enemies, and by being voluntarily placed under the protection of the enemy's armed force; and it is further contended that the possession of such license is evidence of an illegal commercial intercourse with enemies, and of enemies' interest in the concern; or of subserviency to the views of the enemy; in violation of the duties of the citizen and of his allegiance.

What shall constitute a hostile character, is sufficiently well determined in many instances, which are strongly marked. One characteristic is, the sailing under the flag and pass of the enemy. This is conclusive as to the character of the ship, and is a complete bar to the claims of an asserted neutral proprietor. 5 C. Rob. Adm. (Am. Ed.) 13. If assumed by a subject of the capturing belligerent, it would be equally conclusive as to goods, and would be decisive against the admission of any claim. In giving judgment on a case of this description, in relating to the Dutch flag and pass, assumed by a neutral, Sir W. Scott observes, that ships have a peculiar character impressed upon them by the special nature of their documents with which they are so invested, as to the exclusion of any claims of interest that persons living in neutral countries may actually have in them. In the same case he makes a distinction, however, between such a complete adoption of the hostile character, and a pass or license for a particular purpose, relative to the enemy's trade, without an alteration of the neutral character of the ship. The council for the claimants, in the Case of the Vrow Elizabeth, cited the Case of the Clarissa, in which the American owner obtained restitution of his share of the ship, though the vessel had sailed from Holland under a special pass or license from the authority of that country, to engage in the colonial trade. In that case, says Sir William Scott, the ship had merely a colonial pass or license, being in all other respects undoubtedly and avowedly an American ship, and described as such in the usual American documents. The distinction is applicable in the present case. The ship and cargo, which are clearly American property, are documented as such; the papers from the officers of the British government, also recognise her as such, and are merely intended to exempt the property from capture by the enemy's cruisers. The arrangement is an unusual one, and we have no express precedent by which to determine its legal operation. Exceptions from capture have sometimes been made by belligerents from motives of humanity, as in the case of fishing vessels, and at one time when Spain was at war with Great Britain and distressed by famine, in favour of vessels bound with grain to that country. Anciently, the admiral of France had the power of forming fishing truces or of granting passports to individuals, to continue their fishing or trade unmolested. It is not contended, that a vessel taking the benefit of these indulgences would be considered as offending, though in the instance of the French passports to fishing vessels, they were occasionally given to individual vessels, and did not operate by a general order or decree. In the present case it was not competent for Admiral Sawyer to give a general security against all the cruisers of his country, but he declares, that he shall give directions to the commanders of the squadron under his command, not to molest American vessels, unarmed, and laden with flour and other dry provisions bona fide bound to Portuguese or Spanish ports, whose papers shall be accompanied with a certified copy of his letter under the consular seal of Mr. Allen. This is the mode adopted to notify the cruising ships of the admiral's instructions. If he had elected another method, and had published his instructions in the Gazette at Halifax, it surely could be no offence against the duties of a good citizen bound on a lawful voyage, to take with him one of the British newspapers, containing such instructions, as a security on such lawful voyage, not prohibited by the laws of his country. A certified copy of the letter, by a known officer, has, as appears to me, no other legal effect or operation. Mr. Allen's consular powers may indeed have terminated by the war, though his residence in the country was permitted, and I shall not undertake to decide on the propriety of his signing in that capacity. It was, probably, considered as a mode which would give greater security to the holders of the instrument, and render it less liable to exception or doubt from the enemy's cruisers. In this view it was rendered more valuable to the holders, and the procedure is entitled to can-

did consideration; at any rate, I cannot consider it as giving a vicious taint to the transaction, so as to subject the citizen receiving such a document to process of condemnation from the authorities of his country, which are to decide upon the operation of the paper. Mr. Allen aims to bestow a more extensive security than what is given by Admiral Sawyer, but it is, as it necessarily must have been, merely advisory. It is addressed to the officers of all the ships of war of his country, public or private.

The views and intentions manifested by those officers in these papers, have been particularly urged in argument. It is said, that they fully express purposes favourable to the .enemy, and that the acceptance of papers with such indications implies a voluntary subserviency to British interests. In whatever terms these papers had · been drawn, no one could suppose that they were granted from mere good will to this country, and if that had been affected, it could have deceived no one. In fact, whether expressed or not, the state of things presented a case in which there was a coincidence of interests. When this trade was left open, after the declaration of war, it must have been understood, that Great Britain would feel an interest in its prosecution. This could not but have been perceived and considered, when the act of the 6th July, 1812 [2 Stat. 778], relative to trading with the enemies of the United States, was passed. The subsequent relaxation of the rights of war and of capture, on the part of the enemy, relative to such trade, only presents a more decided manifestation of the estimated importance of the trade to Great Britain. It still is a legal and innocent trade to our citizens, until prohibited by statute; nor do I conceive that the expressions in the papers should subject the citizen to the imputation of intending the promotion of the views of the enemy; he has his own interest in view, and so far as any public considerations enter into the enterprize, he ought to be considered as favouring the views and interests of the country, who have left the trade open under a full contemplation of the state of the country and of the world, politically and commercially. On the face of the instruments, therefore, and viewing their whole tenor, I consider them not as conclusive against the claimants who are the holders of them. But the relaxation is not universal, and from the very nature of partial exemptions they are liable to a degree of suspicion —though not in themselves absolutely vicious, they may become so by the manner in which they were obtained, or the conditions on which they were granted; I have, therefore, in this case and another of similar description (The Hero) required further proof on this head, and the order for further proof is limited to the claimants, according to the general rule in prize cases. 3 C. Rob. Adm. (Am. Ed.) 267.

By the proof that has been produced. relative to the license in this case, it appears to have been purchased of a citizen of the United States, an inhabitant of Virginia, at the rate of one dollar per barrel for what the vessel would carry; that part of the consideration· was paid in cash, the remainder to be paid on arrival of the vessel in Lisbon: that the license was in blank, and the person procuring the license declares, on oath, his belief, that the seller had no knowledge of or concern with Mr. Allen by whom the license was issued It is further testified that such licenses are a common article of sale in Baltimore and .other places. On this evidence, I cannot conclude that any enemy interests are involved in the transaction, or that the terms on which the license was obtained, render it a vicious transaction, operating the forfeiture of the property intended to have been protected. The act of July 6th prohibits. under heavy penalties, the receiving, accepting or taking "a license from the government of Great Britain, or any officer thereof, for leave to carry any merchandise, or send any vessel into any port or place, within the dominions of Great Britain, or to trade with such port or place." The mere receipt and acceptance of a license or security from capture, in a lawful trade to neutral countries, is not prohibited. If not procured on terms involving enemies' interests, I cannot find the rule of law,· which renders the vessel and cargo liable to condemnation, in our courts; for being possessed of such an instrument of protection, I am sensible, that the practice may be liable to abuse. It is capable of being converted into an instrument of monopoly, or the practice may have political bearings of serious import. This liability to abuse renders it, as I conceive, the duty of the court to require such proof of the manner of procuring the license, and of the terms and conditions, as shall enable it to form an opinion as to the fair and legal operation of the procedure. I am not convinced, from the evidence in this case, that the transaction relative to this license will subject the property claimed to condemnation. There may be considerations relative to the practice of dubious aspect. which it belongs to the government to estimate, and to make such provisions as the public interest shall appear to require.

The other ground of objection, is the direction to invest the proceeds of vessel and cargo in bills of exchange, to be remitted to England. The directions for the sale of the vessel are not absolute, it was to depend on the contingency of receiving an advantageous offer—If sold, however, the proceeds are directed to be remitted to England; some of the shippers direct the investment to be made in government bills, meaning, it is admitted, the bills of the English government. Others direct a remittance generally. As to the captain's adventure, it does not appear

in what manner it was his intention to dispose of the proceeds. Now if this property was intended merely to be landed at Lisbon, and to be afterwards transhipped to the enemy's country, it would clearly be a trading with the enemy, and such intention being manifested, it would be liable to condemnation, if captured in any stage of the voyage. The Jonge Pieter, 4 C. Rob. Adm. 65. But I am by no means satisfied, that the orders given in this case, as to remittance of proceeds would, if executed, be of like legal operation. To produce a conclusion of such serious consequence to the owners of the property, I ought to be assured, that there would be no mode of effecting the proposed remittances without implicating the claimants in the culpability of trade with the enemy. Now it is observable, that all the cases, and they are numerous, which have been cited from the books, respecting trade with the enemy, relate to tangible objects, capable of actual use for the purposes of life i. e. to goods and merchandise bound to or from the enemy's country. Of this description are all the instances cited in the case of The Hoop, 1 C. Rob. Adm. (Am. Ed.) 196, in which the law on this subject is so fully' displayed and illustrated. I do not mean to infer, that other transactions would not constitute a trade with an enemy. It certainly may be committed by going to or coming from an enemy's country with a vessel without a cargo. But no case has been produced, though the attention of the able and learned counsel for the captors was specially directed to the inquiry in which the usual operations of exchange were considered as of this character. In fact, by an analysis of those operations, it will appear, that a substantial difference exists, in regard to aid an enemy between a trade in commodities, and what is called a remittance. If a citizen should convey commodities to an enemy's country, he affords him palpable aid, and the act is illegal. But if he should purchase of a fellow citizen, or of a neutral, a debt or demand against a subject of the enemy country, he renders no benefit to the enemy, there is only a change of the creditor. If the remittance be to pay a debt, the enemy country is indeed a gainer to the amount of the debt. How a remittance for such a purpose in time of war should be considered, it is not necessary here to inquire. The remittances in this case were specially intended as a deposit, until there should be an opportunity to withdraw the amount.

It is decided that a subject of one belligerent may lawfully purchase of a neutral, goods, or vessels, lying in a port of the opposing belligerent. The trade, in such case, is with the neutral, and the locality of the objects purchased does not vitiate the transaction. 4 C. Rob. Adm. (Am. Ed.) 233; Chit. Law Nat. 15. From this authority I should infer, that the supercargo, on this voyage, might lawfully purchase of a subject of Portugal, his debt

or demand on England, or in other words his bill of exchange on England. But it is observed, that according to the direction of some of the shippers, the investment was to be made in government bills. Such an investment, it is urged, would be particularly noxious, having a tendency to sustain the credit and give additional value to the enemy's paper. So far as such direction may be evidence of an intent of a commercial dealing relative to this cargo or any portion of it with subjects of the enemy it is pertinent. But I do not consider it warrantable for me to make that inference, without more direct evidence. Government bills, as they are termed, it is affirmed, and I presume the fact is so, are in the market, bought and sold like other articles. A bona fide purchase of an English bill, of a neutral, would not place the party, on legal ground, in a different situation from the purchase of the bill of an individual. It would be otherwise, if the neutral were the mere agent, to procure such government bills from the British holder.

It cannot be denied that investments in government bills, would have a tendency to enhance the value of those bills in the market. This indirect effect, however, of the operation, would not as appears to me, render it criminal. By the law of war, we are not to benefit an enemy; on the contrary, according to Bynkershock, "Vetatur quoquo modo hostium utilitati consulere." We are not to consult the benefit of the enemy, and of course that trade and those operations are, by the law of war, illegal, which from their character, imply such a motive. But such is the connexion of human affairs, which national conflicts cannot altogether dissolve, that many operations may have an indirect effect to benefit the enemy, and yet the law of war has not considered them, embraced within its maxims of prohibition. If, for instance, the proceeds of the numerous shipments to Spain and Portugal from this country should be invested in British goods, it would undoubtedly aid the enemy, by the encouragement given to its manufactures, and in a degree, to its commerce. Still such purchases would be lawful to our citizens, if made bona fide of a neutral owner, such goods, thus purchased, might be lawfully transported to any other neutral country. The mere law of war, indeed would not prohibit the importation of goods, so purchased, even to our own country. It is our law of non-importation, made before the war, which has this operation.

If such investment be not illegal, I am not satisfied, that evidence of the debt, thus purchased of a neutral, might not be transmitted from the neutral country, without coming within the legal idea of trade with an enemy, as developed and illustrated by the cases which have been decided. It was, for a long time, lawful in England to insure enemies' property, and such was the common practice in that country in former wars with

France. Valin, in language, as Marshall observes, bordering a little on derision, remarks on the impolicy of such a rule of law, which was peculiar to England, and suggests the benefit derived from it by France. But we find no intimation, that the procurement of such insurance in England, by a subject of France, was illegal, nor is it made subject to any animadversion; and yet such insurance could not have been effected without a correspondence. So when in England, in the modern trials upon policies of this description, the foreign holder of the policy has been held not entitled to recover, the objection has not been made, even in argument; that the creation of the policy, which would necessarily involve a degree of communication with the enemy, was an act of trading; but that the object and effect of such policy was to protect the trade of the enemy. If, therefore, it were now lawful in England to insure enemies' property, it would not, as appears to me, come within the idea of trade with the enemy, for a citizen of this country to procure such insurance, though it could not be accomplished without a communication direct or indirect with that country. The same reason would apply to the mere transmission of the evidence of a debt or demand on an enemies' country, lawfully acquired.

I acknowledge the general obligation, of bringing every correspondence with the enemy, under the cognizance of government. A correspondence, intrinsically innocent, may be culpable from a non-conformity with regulations, calculated to assure the government, that nothing injurious is to be apprehended from any proposed communication. It would be reasonable, however, to expect a promulgation of such regulations, that every one might be secure from dangerous inadvertence. Besides, as the government has a public agent in Lisbon, and the charge in this case rests on intention, I ought not to conclude, that any correspondence, which the proposed remittance of bills to be purchased might require, would not be submitted to his inspection.

In speaking of the doctrine of insurance on enemies' property, as it formerly stood, I cannot omit to notice its application to the first objection in this case, grounded on the license from an enemy. The reasons which have led the courts of law in Great Britain, ultimately, to decide against the validity of such insurances, after long practice to the contrary, might cause that country to be dissatisfied with these indulgences granted by its officers; and for the reasons which induced France not to discountenance or disapprove of the procurement of insurances in England, in time of war, between the two countries; may we conclude, as to the innocence of obtaining these licenses or protections, if tainted with no improper contract or conditions.

Such are the views which I have taken on this subject. In contemplating the questions on which the cause depends, and in searching for just inferences from acknowledged principles, and from analogous determinations, I should not be surprised if my conclusions should be found erroneous, in which case they will be corrected by a superior tribunal, if the captors should be dissatisfied. I decree restitution to the claimants; but I do not think the captors should sustain the costs of bringing the case to adjudication, especially as further proof was requisite, and the obvious facts might induce the course pursued by the captors, consistently with sincere and honest conviction, that their procedure was justifiable. I therefore direct the payment of their necessary expenses.

NOTE. In the case of The Aurora [Case No. 660], an American vessel condemned by Judge Howell in the district court of Rhode Island, for having a Sawyer-license on board, it appeared that the vessel, which was bound to St. Barts, had a certificate from Andrew Allen, Esq., late British consul, stating, "that the voyage was intended to answer the views of the admiral's license, viz. a supply of the British West Indies. And it is understood, that, on the ground of a British supply being intended, and proceeded in, the condemnation took place.

### The License.

"His Majesty's Ship Centurion, at Halifax, the 5th August, 1812.—Sir: I have fully considered that part of your letter of the 18th ult. which relates to the means of insuring a constant supply of flour and other dry provisions to Spain and Portugal, and to the West Indies, and being aware of the importance of the subject, concur in the proposition you have made. I shall therefore give directions to the commanders of his majesty's squadron under my command, not to molest American vessels unarmed and so laden, bona fide bound to Portuguese or Spanish ports, whose papers shall be accompanied with a certified copy of this letter under your consular seal. I have the honour to be, sir, your most obedient humble servant. H. Sawyer, Vice Admiral. Andrew Allen, British Consul, Boston. (Stamp. Arms of the British King.)"

"Office of His Britannic Majesty's Consul. I, Andrew Allen, Jr. his Britannic majesty's consul, for the states of Massachusetts, New-Hampshire, Rhode Island, and Connecticut, hereby certify that the annexed paper is a true copy of a letter addressed to me by Herbert Sawyer, Esq. vice admiral and commander in chief on the Halifax station. Given under my hand and seal of office, at Boston in the state of Massachusetts, this fifteenth day of September, in the year of our Lord, one thousand eight hundred and twelve. [Signed] Andrew Allen, Jr. (Consular Seal.)"

"To All Officers of His Majesty's Ships of War or of Privateers Belonging to Subjects of His Majesty: Whereas, from a consideration of the vital importance of continuing a full and regular supply of flour and other dry provisions to the ports of Spain and Portugal or their colonies, it has been deemed expedient by his majesty's government, that notwithstanding the hostilities now existing between his majesty's government and these United States, every degree of protection and encouragement should be given to American vessels laden with flour and other dry provisions and bound to the ports of Spain and Portugal or their colonies; and whereas in furtherance of these views of his majesty's government, Herbert Sawyer, Esq. vice admiral and commander in chief on the Halifax station, has directed to me a letter under the date of 5th August, 1812, (a

copy of which is herewith enclosed) wherein I am instructed to furnish to American vessels so ladened and destined, a copy of his letter, certified under my consular seal, which documents are intended to serve as a perfect safeguard and protection to such vessel in the prosecution of her voyage. Now, therefore, in prosecution of these instructions. I have granted to the American brig called the Hiram, of 219 tons burden, whereof John B. Barker, is master, now lying in the port of Baltimore, and ladened with flour and bread, bound bona fide to the port of Lisbon, a copy of the said letter of Vice Admiral Sawyer, certified under my consular seal—hereby requesting all officers of his majesty's ships of war or of private armed vessels belonging to subjects of his majesty, not only to offer no molestation to the said vessel, but on the contrary, to grant her all proper assistance and protection in her passage to Lisbon, and on her return from thence to her port of her original departure, whether laden with salt, or in ballast only. Given under my hand and seal of office, this 15th day of September, in the year of our Lord one thousand eight hundred and twelve. (Seal) Andrew Allen, Jun., His Majesty's Consul."

[NOTE. From this decree an appeal was taken to the circuit court (case unreported), where the decision above rendered was affirmed pro forma, but the captors allowed their expenses. Both parties then appealed to the supreme court. 8 Cranch (12 U. S.) 444. In an opinion by Mr. Justice Washington the decree was reversed. and the vessel and cargo condemned to the captors as prize of war. It was held that the real object of the license was to insure a supply of provisions to the allied armies in Spain and Portugal. thus making an unlawful connection with the enemy. The law presumes that the license was known to the owner of the cargo as well as the owner of the vessel. "The sailing on a voyage under the license and passport of protection of the enemy, in furtherance of his views or interests, constitutes such an act of illegality as subjects the ship and cargo to confiscation as prize of war."

[Subsequently, from a decree of condemnation in the lower court. other claimants took an appeal, upon the ground that they had no notice of the license from the British consul. The supreme court, in an opinion by Mr. Chief Justice Marshall, affirmed the sentence. 1 Wheat. (14 U. S.) 440. It was held that however innocent, in point of fact. the claimants might have been, of the knowledge that the Hiram sailed under a British license, constructive notice of that fact must be imputed to them, because the supercargo must be considered the agent of the shippers, and his knowledge is their knowledge.

[The taxation of costs in this and similar cases was made in Case No. 6,527.]